167 P.2d 386

**BURNEY v. SMITH et al.**

No. 4804.

Supreme Court of Arizona.

March 25, 1946.

Carl D. Hammond, of Kingman, for appellant.

Cunningham & Carson, of Phœnix, for appellee Perry A. Yeast, Jr.

E. Elmo Bollinger, of Kingman, for appellee J. M. Smith.

STANFORD, Chief Justice.

Appellant, plaintiff below, brought suit against J. M. Smith and P. A. Yeast seeking a money judgment, an accounting and for other relief. At the time summons was issued service could not be had upon Yeast. Service was had upon Smith, who answered. Thereafter Perry A. Yeast, Jr., who had succeeded by assignment to the interest of P. A. Yeast, voluntarily appeared by way of interpleader, filed an answer and cross-complaint. The fact situation out of which the controversy arose is as follows:

Prior to February, 1941, P. A. Yeast (assignor) owned and controlled considerable range land in Mohave County, Arizona. In addition to his deeded lands, he had numerous leases and federal grazing permits. At this time his ranch being understocked, he entered into an oral agreement with the appellant whereby it was agreed that they would purchase some Mexican cattle at El Paso, Texas. The exact number purchased was 1,466 head. After the cattle were imported, they were branded 7–Y, a brand belonging to the appellant. The cattle were then shipped to the ranch of Yeast in Mohave County. The oral agreement under which the cattle were purchased was later reduced to writing but was not finally executed until the following September. This agreement, in part, is as follows:

"Witnesseth: That whereas, the second party is the owner and lessee of ranches, and ranges in Mohave County, Arizona, known as the 'Old Spear Ranch' and the 'Old East' or 'Gold Basin Ranch,' and also is the owner of certain cattle thereon in which first party has no interest, and

"Whereas, there are now located on said ranches approximately one thousand four hundred sixty-six head of steers branded 7–Y on the left hip and which cattle are owned by second party and first party under an arrangement providing for an equal division of the profits thereon, and which cattle were purchased by the parties hereto at a total cost of Forty-eight Thousand Two Hundred Fifty-nine Dollars ($48,259.-00), said amount including the original cost of said cattle, the freight thereon and interest on such sum at five and one-half per cent per annum to July 23, 1941, and which said sum, together with interest thereon from the said 23rd day of July, 1941, until paid is owed to The Valley National Bank of Phœnix, Arizona, secured by a mortgage upon all of the ranches of second party and upon the steers branded 7–Y on the left hip, so owned by first and second parties, and

\*    \*    \*    \*    \*    \*

"It is further agreed that the steers mutually owned by the parties hereto shall be sold only upon the agreement of the parties hereto.

"Upon the disposition of said cattle, so mutually owned by the parties hereto, the proceeds thereof shall be applied to the payment of the indebtedness, with interest thereon, to the Valley National Bank, hereinabove referred to, and the balance of the proceeds of the sale of one thousand four hundred sixty-six head of cattle branded 7–Y shall be divided equally between the first party and the second party, provided however, that upon such division the first party shall pay from his share thereof to the second party an amount equal to thirty-five cents per head per month from and after July 23, 1941, for one-half of the cattle branded 7–Y, so sold, from the said date to the date of such sale. Provided further that first party shall be obligated to pay such sum only to the extent and solely from the amount so received by him as his share of said profits.

"Second party agrees that upon the application of the proceeds of the said sale of approximately one thousand four hundred sixty-six head of cattle branded 7–Y to the obligation of the said Bank, above referred to, second party will forthwith pay any balance due on the said entire obligation to the Valley National Bank, including interest thereon, or will forthwith obtain the release of the first party from his obligation as guarantor on such obligation, it being the specific intention of the parties hereto that first party's obligation to said bank is solely that of guarantor, except to the extent that the proceeds of the said one thousand four hundred sixty-six head of cattle branded 7–Y will pay on the said obligation to the said Bank, and no more.

"Second party further agrees that whenever the cattle branded 7–Y are to be shipped, first party shall be given reasonable notice of the time and place of shipment so that he may be present in person, or by a representative."

For reasons which will appear later appellant lays great stress upon the following portions of the agreement: the "cattle are owned by second party (Yeast) and first party (Burney) under an arrangement providing for an equal division of the profits thereon, * * *." "It is further agreed that the steers mutually owned by the parties hereto shall be sold only upon the agreement of the parties hereto."

The cost of the cattle f. o. b. the ranch was $48,259. Burney and Yeast both went to El Paso and effected the purchase of the cattle. They were paid for by draft drawn on the Valley National Bank by previous arrangement. The arrangement was that Yeast would execute his note for the purchase price which was to be secured by a chattel mortgage on the cattle, a realty mortgage on Yeast's ranch, a chattel mortgage on additional cattle owned by Yeast, together with assignments of his.

leases and grazing permits. Burney was well aware of the fact that the loan was so secured. In addition to this security, Burney gave the bank his written guaranty that he would repay the loan in the event that Yeast did not. On one or more occasions it was necessary to renew the loan. The bank had also agreed to advance Yeast sufficient monies for operational expenses. The last renewal of the note was on January 31, 1942, and was for the sum of $56,563.30. It became due and payable on July 1, 1942. At the time of the renewal and subsequent thereto the bank advised both Burney and Yeast that it would not renew the note and that it would have to be paid on the due date. By May 1st, there was approximately $60,-000 due on the note and mortgage.

On the 28th day of April, 1942, P. A. Yeast entered into an agreement with defendant J. M. Smith whereby he sold to Smith all of his deeded lands, leased lands, grazing permits, water rights, and equipment, together with all the cattle then on his holdings. Included in the cattle sold were the 7-Y cattle. Yeast represented to Smith that there were 2,000 head of cattle on the ranch. The basic price for the ranch and cattle was $116,000 which was to be subject to readjustment. Yeast agreed that when the cattle were counted out, $50 per head could be deducted from the sale price for each animal under 2,000 head not produced. Smith agreed that he would pay an additional $50 per head for those in excess of 2,000 head.

The chattel mortgage given by Yeast on the 7-Y cattle contained the usual warranty that he was the owner of the cattle and that they were free from liens. Appellant Burney had knowledge of this representation.

Yeast did not advise Burney that he had sold his ranch and the 7-Y cattle. In this respect, he breached his agreement with Burney.

At the time Smith purchased the cattle he was aware of the fact that Burney had an interest or expectancy in the profits, if any, to be derived from the sale of the cattle. The following paragraph was contained in the Yeast-Smith contract. "It is understood by and between the parties hereto that Ben Burney has an interest in the 7-Y cattle, hereinabove described and to be described in said Bill of Sale, and first party guarantees that he will settle with the said Ben Burney on the said 7-Y cattle, without cost to second party."

On the first day following his purchase Smith sold four head of the 7-Y cattle for an average price of $63 per head; ten days later he sold one head for $74.20; forty-eight days later he sold 873 head for $53.28 per head. Evidence was offered that these 873 head were the largest and heaviest of the 7-Y stock. Some 159 head of smaller 7-Y steers were cut back and together with the remaining 7-Y steers were sold in June, 1943. In October, 1943, Smith sold 5 head at an average price of $69; and in December, 1943, 8 head at

an average price of $33. In June, 1943, he sold 400 head at $87 per head. These 400 head were 13 months older than when purchased and were thus larger steers. The price of cattle had materially risen in the preceding months.

On or before June 28, 1942, from the monies derived from sales of 7–Y steers and others that he had purchased from Yeast, Smith paid off the Yeast obligation to the bank and secured a release of all the mortgages. The amount required to make this settlement was $62,756.77.

In the lower court appellant sought the following relief: 1. Judgment for an accounting against Yeast of the proceeds of the sale to Smith. 2. Judgment against Smith for the alleged conversion by Smith of appellant's asserted one-half ownership in the 7–Y cattle. 3. An injunction against Smith enjoining him from selling any of the 7–Y cattle on the ranch at the time the complaint was filed—July 3, 1942. 4. Judgment against Smith for an accounting of the proceeds of the sale of 7–Y cattle by Smith.

The intervenor Perry A. Yeast, Jr., by his answer disclosed the entire transaction, and claimed that the sale by his assignor was made of necessity to pay the bank and prevent foreclosure against his entire holdings. He admitted that appellant had an interest in the profits of the sale; and that interest should be granted from the date of the sale from Yeast to Smith, April 28th; and that the reasonable value of all of the 7–Y cattle at that date was $50 per head. The intervenor in his cross-complaint set up an account of all the proceeds received and to be received from the sale of the 7–Y cattle to Smith. He asked the court to settle such account and render judgment against him in favor of appellant fixing amount due to the date of judgment, and that the court retain jurisdiction to make provision for payment of one-half of the net proceeds of the sale of any strays of 7–Y cattle that might be later found.

It was appellant's theory that he and Yeast were joint adventurers; that Smith had knowledge of his interest and ownership in the cattle; and that Smith was not a bona fide purchaser for value without notice. He, therefore, attempted to press Smith into the shoes of Yeast. He claimed that he was entitled to graze the cattle on Smith's ranch; pay the pasture rent provided in the original Yeast-Burney contract; and that he was entitled to one-half of the net profits of all of the sales made by Smith. His demand was for $13,376.03.

It was the contention of the intervenor that Yeast was the sole owner of the cattle and had the right to sell them; that the sale was effected on April 28, 1942; and that the proceeds were to be calculated as of that date at $50 per head. There was ample evidence offered that the 7–Y cattle on April 28th were reasonably worth $50 per head and no more taking the whole herd into account.

The trial court adopted the theory of the intervenor and entered judgment against him for the cattle found and accounted for up to April 14, 1944, the date of the trial. The judgment was for $5,170.51 with interest from April 28th, the date of the sale to Smith. The court retained jurisdiction and appointed Smith its special master to report any additional 7–Y steers subsequently sold by him. The court also decreed a lien on all monies owed by Smith to Perry A. Yeast, Jr.; ordered Smith to pay into court sums due and to become due on the judgment; ordered the intervenor to give credit to Smith for all sums paid into court by Smith; and reduced the debt of Smith to Yeast by the amount so paid. Appellant was enjoined from claiming any interest in the 7–Y cattle except as to his interest in the proceeds of any sales as provided in the judgment.

Appellant assigns as error: 1. The refusal of the court to grant judgment against Smith, this upon the theory that the cattle were the joint property of appellant and Yeast, and that Smith was not a bona fide purchaser for value without notice. 2. Failure of the court to render judgment against Smith for an accounting of amounts received by him from the sale of the cattle, this upon the theory that Smith was holding plaintiff's share as trustee. 3. That the court erred in rendering judgment restraining appellant from claiming any ownership in the cattle. 4. That the judgment is contrary to the evidence and law.

In support of the first two assignments of error, appellant offers the following two propositions of law:

"1. One of two or more joint adventurers cannot sell the property of the adventure without the consent of his co-adventurer.

"2. A purchaser of social property from one of two or more joint adventurers with knowledge of the right and title of the other or of facts sufficient to put him upon inquiry as to the rights of the other party to such joint adventure takes it subject to such rights."

Counsel for appellant suggests that the Burney-Yeast contract discloses that they were joint adventurers. In support of his propositions of law he has submitted the following citations:

"*Transfer of Property.*—A party to a joint adventure has no right to dispose of the property of the adventure, or at any rate of his coadventurers' interests therein, to a third person, without the consent of his coadventurers. Accordingly, a purchaser of social property and business from one joint adventurer with knowledge of the right and title of the other, who has been excluded from the enjoyment thereof, or with knowledge of facts sufficient to put him on inquiry as to the rights of the excluded party, takes it subject to such rights." 30 Am.Jur. 700, Joint Adventures, Sec. 43.

"A purchaser of social property and business from one partner or adventurer, with

knowledge of the right and title of the other who has been excluded from the enjoyment thereof, or of facts sufficient to put him upon inquiry as to the rights of the excluded party, takes it subject to such rights." Kaufman v. Catzen et al., 81 W.Va. 1, 94 S.E. 388, L.R.A.1918B, 672.

These citations are entirely inapplicable as we will point out. A close analysis of the Yeast-Burney contract discloses: 1. That Yeast was the sole owner of the cattle. They were paid for with his money. They were to be grazed on his ranch without any expense to the appellant. In the event that the cattle sold for a profit, Yeast was to receive 35 cents per head per month pasture rent on half the cattle. If the cattle did not sell for a profit, appellant was under no obligation to pay any pasture rent. The contract specifically provides that appellant's obligation to the bank was solely that of a guarantor. The contract required Yeast to apply the proceeds to be derived from the sale of the cattle to the payment of the obligation at the bank. If the proceeds were insufficient, Yeast, being primarily liable, would have had to pay it, the contract so provides. In the event the cattle had died, the entire loss would have been on Yeast. In truth and fact, Yeast was the sole owner of the cattle, and the references in the contract that they were mutually owned are misleading, and were undoubtedly inserted in the contract by way of moral persuasion to substantiate and fortify appellant's right to a half interest in the profits.

Considering Yeast's investment which had grown from $48,000 to $62,000, and the hazards involved, we do not think that he was in law or in good conscience required to allow the appellant to speculate with his (Yeast's) investment. We conclude that when Smith purchased the cattle they became his and he was entitled to dispose of them and any proceeds received therefrom belonged to him. We are of the opinion that the lower court fairly and equitably adjudicated all the issues in the case, and that the judgment entered is in accordance with equity and law.

The judgment is affirmed.

LaPRADE and MORGAN, JJ., concurring.